# CHARLESTON.

STATE v. JACOB LUTZ.

Submitted November 25, 1919. Decided December 5, 1919.

1. JURY—*Discharge of Jury—Drawing of Other Jurors.*

The fact that the jury drawn and empaneled and attending a regular term of the circuit court has been discharged, will not prevent the court, thereafter, and during the same term, when found necessary for the convenient dispatch of business, from requiring other jurors to be drawn by the clerk, as provided by section 14 of chapter 116 of the Code, although the original panel, if it had not been so discharged, might not have been exhausted. (p. 334).

2. SAME—*New Jury List After Discharge of Juror.*

If after the empaneling of a special jury of twenty, and before the twelve chosen therefrom to try one indicted for murder are sworn, it is discovered that one of said jurors is disqualified because he had served as juror within the previous four years, the court may without committing error stand him aside and call another qualified juror and direct the clerk to

make a new list of the twenty chosen, from which the State and the prisoner may be given the right again to strike the names of two and six respectively in selecting the jury to try the case.   (p. 335).

3.   SAME—*Competency of Juror Who Has Expressed an Opinion as to Defendant's Guilt.*

If in selecting such special jury of twenty, one of the number on his *voir dire* is shown to have previously expressed a decided opinion as to the guilt of the accused, based wholly on what he had heard and read in the newspapers, but who swears he has no prejudice or bias against the accused, and that regardless of his previously expressed opinion he felt that after hearing the evidence he could decide the case in accordance therewith, is not disqualified, and the challenge by the prisoner is properly overruled.   (p. 335).

4.   HOMICIDE—*Admission of Evidence—Mental Condition Before Killing.*

Evidence of threats made by one indicted for murder, a few hours before the homicide, that he would kill anyone who undertook to arrest him, though impersonal and directed to no one, is admissible to characterize the mental condition of the accused so recently before the killing.   (p. 336).

5.   SAME—*Instruction on Self-Defense Erroneous.*

Where on such trial there is any appreciable evidence justifying the theory of self-defense, an instruction on the right of the accused to resist an unlawful arrest, but telling the jury he can not do so to the extent of taking the life of the officer, is erroneous and prejudicial, if it does not also advise the jury he may take the life of the officer if he believes and has reasonable grounds to believe that it is necessary to do so to save his own life or his person from great bodily harm.   (p. 336).

6.   INDICTMENT AND INFORMATION—*Offenses for Which Defendant May be Convicted in Homicide Prosecution.*

Upon an indictment for murder, in the form prescribed by section 1 of chapter 144 of the Code, which does not therein also aver facts constituting an assault or assault and battery, it is error in an instruction defining the offenses of which the accused may be found guilty under the indictment, to tell them, if not finding him guilty of the graver offenses covered by the indictment, they may find him guilty of assault and battery. The expression in the opinion of the court in *State* v. *Vineyara,* 81 W. Va., 98, to the contrary, not a point of decision, should be disregarded.   (p. 337).

85 W. Va.

7.  CRIMINAL LAW—*Instruction—Credibility of Witnesses.*

An instruction telling the jury among other things that they may believe or refuse to believe any witness, when passing on his credibility, though apparently approved as given in *State* v. *Bickle*, 58 W. Va. 597, is too broad. The jury may not so arbitrarily refuse to believe any witness, unimpeached. They should be told in the same connection in the alternative that they may give the testimony such weight as under all the facts and circumstances, when fairly and honestly considered by them, they may believe it entitled to. (p. 339).

8.  ARREST—*Criminal Law—Instruction Assuming Lawfulness of Arrest by Police Officer Without a Warrant.*

Instruction for the State numbered fourteen, as applied to the facts in the case, which assumed the lawfulness of the arrest of the prisoner by the chief of police of the City of Grafton, without a warrant, and not in contemplation of law for an offense committed in his presence, or involving a breach of the peace, was erroneous. The rule of the common law, not changed by any statute in this State applicable to municipal police officers of the City of Grafton, was that an officer could not arrest without warrant for a misdemeanor even when committed in his presence, unless involving a breach of the peace. (p. 339).

9.  SAME—*"Offense Committed in Officer's Presence."*

An offense can be said to be committed in the presence of an officer only when he sees it with his own eyes, or sees one or more of a series of acts constituting offense, and is aided by his other senses or by information as to the others, when it may be said the offense was committed in his presence. (p. 339).

10.  SAME—*Confession Not Taking the Place of Actual Sight of the Offense.*

A confession elicited from the accused by an invasion of his person by the officer, as by slapping his hands on his pockets, will not, in the absence of statute authorizing it, take the place of actual sight of the offense. (p. 344).

11.  CRIMINAL LAW—*Refusal of Instruction, Unsupported by Evidence.*

An instruction though propounding a correct legal proposition, is rightly rejected if there be no evidence justifying it. (p. 345).

12.  HOMICIDE—*Right of Officer to Arrest for a Misdemeanor Without a Warrant.*

An instruction telling the jury among other things that if an officer makes an arrest for a misdemeanor without a warrant, he does so at his peril, without also defining the rights

and duties of officer and accused in such a case, is rightly rejected, as being an incomplete statement of the law and tending to mislead the jury. (p. 345).

13.  ARREST—*Police Officer's Authority to Arrest Without a Warrant.*

Defendant's instruction number twelve, which would have told the jury in substance that under Ordinance LV of the City of Grafton, relating to intoxicating liquors, a police officer had no authority to make an arrest for a violation thereof without a warrant, and that the defendant's arrest by the deceased was unlawful, stated a correct legal proposition and was erroneously rejected. (p. 346).

Error to Circuit Court, Taylor County.

Jacob Lutz was convicted of murder in the first degree, his motion for a new trial was overruled, and from the judgment on the verdict he brings error.

*Reversed and remanded.*

*J. Frank Wilson,* for plaintiff in error.

*E. T. England,* Attorney General, and *Henry A. Nolte,* Assistant Attorney General, for the State.

MILLER, PRESIDENT:

The homicide occurred February 9, 1919, while the circuit court was still in session, but had discharged the petit jury on February 6, and was about to adjourn. A special grand jury was summoned on February 12, convened on February 14, and the same day returned an indictment against the defendant, in the form prescribed by section 1 of chapter 144 of the Code, charging that on the —— day of ——, 1919, he did "in the said county of Taylor feloniously, wilfully, maliciously, deliberately and unlawfully slay, kill and murder J. E. B. Phillips, against the peace and dignity of the State." This was the entire substance of the indictment. Neither the manner nor the instrument with which the alleged offense was committed is therein averred. This statute prescribing this form provides that "upon the trial of such indictment the accused may be convicted of either voluntary or involuntary manslaughter, as the evidence may warrant."

The defendant was arraigned on February 15, 1919, pleaded not guilty, on which issue was joined by the prosecuting attor-

ney; and the case was set for trial on February 18, 1919. On the day of the trial he was permitted to withdraw his plea, and thereupon tendered but was not permitted to file a plea in abatement; and also a motion to quash the panel of jurors, which was overruled. Both plea and motion covered the same subject, and were based on the proposition that the jurors were irregularly drawn, as the panel for the term discharged on February 6, had not been exhausted. The prisoner then entered his plea of not guilty, on which issue was again joined.

The prisoner then moved for a continuance, because of the absence of witnesses, and his counsel requested time to prepare his affidavit in support of his motion, which was denied, but counsel was permitted to call the defendant to the bar and examine him on the subject, after which the motion was overruled. The case was then tried before the jury empaneled and sworn, who on February 19, returned a verdict of "guilty of murder in the first degree." On February 26, 1919, defendant's motion for a new trial was overruled, and the judgment of the court now presented for review was that the defendant be taken to the penitentiary, where on the 27th day of June, 1919, he be hanged by the neck until he be dead.

The rapidity with which the prisoner was disposed of after the homicide was such as to satisfy the most extreme views on this subject.

As the judgment must be reversed on other grounds, we need not regard the point of error urged with respect to defendant's motion for a continuance. The same conditions are not likely to be again presented calling for any ruling of the court thereon.

And for like reason it is not likely that a motion to quash the panel of petit jurors will be involved on another trial. But we may not go amiss in saying that we think there is no merit in the point. The theory of counsel seems to be that though the regular jury summoned for the term had been discharged on February 6, that panel had not been exhausted or so disposed of as to warrant the court in summoning another jury to try defendant. We find nothing in the statutes relating to the subject justifying such a construction. True, section 3 of chapter 116, and the sections following, contemplate and provide that the jurors drawn and listed as there provided, shall be

exhausted before another list is made, but nothing is found in any section justifying the conclusion. that the circuit court in such an emergency as here presented could not have drawn and empaneled another jury lawfully to consider the new business thus arising. The record shows that the jurors so drawn were from the list theretofore prepared by the jury commissioners, and that it was not then or thereby exhausted. Besides, section 14 of said chapter provides that: "Nothing contained in the preceding sections shall prevent any court, in term time, from requiring other jurors to be drawn by the clerk, in the presence of the court, and to be summoned whenever it shall be found necessary for the convenient dispatch of business," only so the said list prepared by the jury commissioners shall be exhausted before another list is made out.

Another point of error presented and relied on is that after a panel of twelve jurors had been drawn and selected, and the State had struck two and the prisoner six, the court over defendant's objection excused Otto B. Kelly, one of said jurors. The court certifies in one of defendant's bills of exceptions that Kelly had served as a petit juror within the last four years, and was thereby rendered ineligible. Section 3 of said chapter 116 in express terms disqualifies such person and prohibits the jury commissioners from placing his name on the list of jurors as provided therein. The record furthermore shows that when it was discovered Kelly was disqualified and another juror was selected and drawn, the court caused the clerk to make out an entirely new list, and the State and the prisoner were permitted to strike over again from this new list. There was no error in this proceeding.

Another point of error is that the court over defendant's objection retained on the panel of jurors one Lee Reynolds. The ground upon which his qualification was challenged was that he admitted on his preliminary examination that he had made up and expressed in vigorous terms, as late as the morning of the trial, an opinion on the guilt of defendant; but he showed that his opinion was based wholly on what he had heard and on newspaper reports he had read; that he had no bias or prejudice in the world against the prisoner; and that notwithstanding he had expressed himself, he felt that he could on hearing

the evidence try the case and decide it according to the evidence. Reynolds was stricken off by the State or the prisoner and did not sit on the trial. We see no prejudicial error in the ruling of the court.

We come next to the consideration of the prisoner's exceptions to the rulings of the court on the admission of certain evidence of the State's witnesses Harry Barnhouse and Frank Jenkins. The substance of Barnhouse's testimony was that on Friday or Saturday before the homicide on Sunday defendant said to him, exhibiting a pistol, that he was out once more; that it had cost him sixty-five dollars to get out; and that he was going to kill the first one who attempted to arrest him, but used no words indicating any particular person or class of persons to whom his threat was directed. The substance of the evidence of the witness Jenkins was, that on Sunday morning before the homicide, going up the stairway of the Y. M. C. A. building, defendant said: "Jenks, there ain't anybody going to take me ever." And when the witness inquired why, the prisoner answered: "I will kill the first son of a bitch that tries it." Evidence of this character is often admissible to characterize the mental condition of the accused, and to show the quo animo. And threats thus made, though impersonal and directed to no one, are admissible for this purpose. *Snodgrass* v. *Commonwealth,* 89 Va. 679, citing *Muscoe* v. *Commonwealth,* 87 Va. 460, and *Honesty* v. *Commonwealth,* 81 Va. 283, 300. See also our own cases of *State* v. *Waldron,* 71 W. Va. 1, and *State* v. *Young,* 82 W. Va. 714.

Numerous points of error are presented respecting the giving and refusing of instructions. The court of its own motion gave one instruction based on the theory of unlawful arrest, and told the jury that one may resist such arrest but not to the taking of life, and that if on such resistance he kills the officer, he is guilty of manslaughter, or if the facts and circumstances show malice, he will be guilty of murder. The prisoner's evidence was that before he fired the shot the officer hit him on the head with his mace, and that he thought he saw a gun in the hand of the officer, and his claim was that he was acting in self-defense. The instruction, we think, is therefore misleading, for the law is that one may take life in resisting an unlawful

arrest, if he believes and has reasonable grounds to believe it is necessary for him to do so to save his own life or his person from great bodily harm. This element is omitted from the instruction, and for that reason it is erroneous. *State* v. *Clark,* 64 W. Va. 625, 641; *State* v. *Donahue,* 79 W. Va. 260.

On motion of the State the court propounded to the jury sixteen several propositions of law, to all and each of which, except those numbered one, two, three, twelve and thirteen, the prisoner by counsel objected. The objection in general was that they were abstract, misleading, and tended to confuse the jury.

The prisoner's counsel submitted some fourteen propositions of law embodied in several instructions to the jury, to number five, six, eleven, twelve and thirteen of which the State objected, and the objections were sustained; but the court proposed to modify in certain particulars instructions six, eleven and thirteen, which modifications were declined by the prisoner, and they were not given in any form. Of these instructions we will take further notice hereafter.

Instruction number one for the State and number one given at the request of the defendant each told the jury in substantially the same language that under the indictment they might find the prisoner guilty of murder in the first degree or second degree or manslaughter, voluntary or involuntary, or simply of assault and battery, according to the facts proven in the case. These instructions went to the jury without objection. As the prisoner did not object to that of the State and the same instruction was given at his instance, and he was found guilty of the highest degree of crime charged in the indictment, he has probably waived any right to complain of the State's instruction, and certainly would not be heard to complain of his own instruction in this court. The question, however, may arise on another trial, and to correct the error therein, and to remove and correct any misconception of prior rulings of the court thereon, we have considered it proper to reconsider and review these instructions with reference to the statutory form of indictment employed in this case. The question presented is, can one so indicted be found guilty of felonious assault or of assault and battery on such an indictment? In the recent case of

*State* v. *Vineyard,* 81 W. Va. 98, 102, an instruction so telling the jury seems to have had the passing approval of this court, though not made a point of decision. In that case the prisoner was found guilty of involuntary manslaughter, and the point now raised by us as to the correctness of the proposition was not then made nor particularly pointed out. As observed before, the same section of the statute which prescribes the form of indictment also says that under it the accused "may be convicted either of voluntary or involuntary manslaughter." It does not say, as the instructions do, that he may also be convicted of felonious assault or of simple assault and battery. The inclusion of voluntary and involuntary manslaughter in the statute would seem on a familiar rule of construction to exclude all other offenses not necessarily included in the charge of murder. At common law and independently of statute it was the rule, in an indictment for homicide, to aver the instrument and means by which the offense was committed, and if these in addition to murder amounted to an assault, the accused might then be convicted of assault or assault and battery, if battery was also averred. But not so where a statutory form of indictment is used which does not describe an assault or assault and battery. *Moore* v. *State,* 59 Miss. 25; *Watson* v. *State,* 116 Ga. 607, 21 L. R. A. (N. S.) 1, and note page 11. The reason for this rule is that murder does not necessarily include assault and battery, as for example when committed by poisoning, and that unless the offense of assault and battery is included, the accused on a trial upon such statutory form of indictment has not had his day on court. In the Mississippi case cited, upon an indictment for assault and battery, the defendant pleaded acquittal by former adjudication upon an indictment for a graver offense which did not include the lesser, and it was held that his plea was properly rejected. So the law is that unless the indictment does describe an offense of the lesser degree not involved in the crime charged, the accused can not be found guilty of the lesser offense, and our apparent approval of any instruction stating the contrary proposition must be regarded as disapproved.

State's instructions number two and three defining murder in the language of the statute, and the burden of proof in such

cases, were not excepted to, and we are not called upon to consider them.

Instructions number four, five, six and seven relate to the presumption of malice, wilfulness, deliberation, and the length of time necessary for the existence of malice in cases of homicide, especially where committed with a deadly weapon, and the burden resting on the accused to show extenuating facts and circumstances to reduce the crime to a lesser degree. We see no error in these instructions in the abstract.

And in the abstract we find no fault in State's instructions eight, nine, ten and eleven. They have been approved in former decisions, and as applied to defendant's theory of self-defense, they are to that extent applicable to the evidence in the case, for there was no controversy as to the fact of the killing. The fact was admitted by the prisoner.

State's instruction number twelve, not excepted to, seems to have been approved in *State* v. *Bickle,* 53 W. Va. 597, 600. Besides telling the jury they were the sole judges of the evidence it told them they might believe or refuse to believe any witness, and that when passing upon the credibility of any witness they might take into consideration his interest in the matter, if any appeared, and his demeanor on the witness stand. In view of our holding in *State* v. *Clark,* point 15 of the syllabus, we think this instruction should have been modified. It is not the province of the jury arbitrarily to disbelieve any witness. They should give his testimony such weight and credit, as upon all the facts and circumstances, fairly and honestly considered, including his interest and demeanor on the stand, they may believe it is entitled to.

Instruction number thirteen given for the State was not excepted to, but numbers fourteen, fifteen and sixteen were. Number thirteen advised the jury that a police officer may *virtute officii,* without a warrant, arrest for a misdemeanor committed in his presence. Number fourteen told them that a person has no right to resist an unlawful arrest, and that if in resisting a lawful arrest he kills the arresting officer with a deadly weapon, he is prima facie guilty of murder. Number fifteen instructed the jury on the law against carrying from one place to another within the State more than one quart of intoxicat-

ing liquors for personal use, and the carrying of a loaded revolver on his person without a State license therefor, and then told them that if they found from the evidence that the accused was placed under arrest by the deceased officer in the act of violating any or all of the laws referred to, such arrest was lawful though made without a warrant. Instruction number sixteen instructed the jury that a police officer has the right and it is his duty to use all reasonable force to prevent the escape of a prisoner after having lawfully arrested him, and that it is murder if one voluntarily kills such officer while resisting an attempt by him to make a lawful arrest whether with or without a warrant if the slayer is chargeable with the knowledge that the officer is acting with authority, and that the same is true if the killing occurs in resisting his attempt to prevent an escape.

One of the vices of instruction number thirteen is that it is inapplicable to the facts proven; another is that in its broad terms it tells the jury an arrest without a warrant may be made in case of misdemeanor committed in the presence of the officer. The instruction is inapplicable to the facts, because there is no evidence that any offense was committed by the prisoner in the presence of the officer. The evidence is that the prisoner was standing on the street offending no one, when the officer approached, placed his hands upon him and felt of his pockets, and inquired of him what he had on him, and was then told by the prisoner that he had three pints. Whereupon the officer put his hand on his left arm and said: "Come with me." Nothing was said or inquired about a pistol, and it does not appear that the officer had seen either liquor or pistol when he made the arrest. The prisoner says, and no one contradicts him, that he was walking down Latrobe Street with the officer when he asked him what authority he had and whether he had a warrant, to which the officer answered he did not need a warrant, and drew his mace and hit him twice on the head, exhibiting his wound to the jury, and that it was in the scuffle when he "bucked" for want of authority in the officer to arrest him, that he drew his pistol and shot twice with no intention to injure him, but for self protection, that his act was done in a moment of passion. At the common law an officer had no

authority to make an arrest for a misdemeanor though committed in his presence unless it involved a breach of the peace. 2 R. C. L. 446-447, and note. The carrying of more than one quart of liquor on his person, as well as the possession of a revolver, unless, in the case of a revolver, a second offense is being committed, constitute but a misdemeanor. The only general statutes we find on the subject are section 9 of chapter 153 and section 221 of chapter 50 of the Code, the first relating to the prevention of crime and the latter to justices and constables. Section 9 of chapter 153 provides: "If any person shall, in the presence of a constable, and within his county, make an affray, or threaten to beat, wound, or kill another, or to commit violence against his person or property; or contend with angry words to the disturbance of the peace; or improperly or indecently expose his person; or appear in a state of gross intoxication in a public place; such constable may without warrant or other process, or further proof, arrest such offending person and carry him before some justice of the peace in the county, in which such offense is committed, who, upon hearing the testimony of such constable and other witnesses, if any are then and there produced, if, in his opinion, the offense charged be proved, shall require the offender to give a bond or recognizance, with security, to keep the peace and be of good behavior for a term not exceeding one year." Section 221 of chapter 50, which is a part of its provisions relating to the prevention of crime, provides: "The proceedings before the justice shall be by warrant of arrest in the name of the State, except that when an offense of which the justice has jurisdiction is committed in his presence, or in that of a constable, either of them may forthwith apprehend the offender or cause him to be apprehended, and in such case the offender may be tried before the justice and dealt with according to law, without such warrant."

It is manifest that section 9 of chapter 153 does not cover the offense of carrying liquor in violation of the State statute, nor is it covered by any ordinance of the city introduced in evidence, nor does either statute or ordinance constitute any modification of the common-law rule. Indeed the statute amounts to little if anything more than an affirmance of the common law, unless

the three classes of offenses lastly mentioned constitute exceptions.

Justices of the peace being clothed with jurisdiction of the offense of carrying liquor from place to place, and of carrying a revolver, a constable for either of these offenses committed in his presence would likely have authority to arrest the offender without warrant. But did the chief of police of the City of Grafton, at the time of the arrest of the prisoner in this case, have any such authority? The right of personal liberty is a very high prerogative right, and to deprive one of that right, without due process of law, we must find specific authority for doing so. It can not be left to inference or some strained construction of statute or ordinance, if such power may be conferred by ordinance of a municipality. We must find specific and direct authority for doing it. We find in section 28 of chapter 47 of the Code, prescribing the authority of town or city council, power "to appoint when necessary a police force to assist the sergeant in the discharge of his duties," also to prescribe the duties of appointive officers. What the duties of the sergeant are, do not appear to be defined by chapter 47, except section 15 says he shall be ex officio treasurer. Perhaps the council might, under section 28, by ordinance enlarge his powers so as to include arrest without warrant. We do not decide this question, for it is not presented. Let us then turn to the charter of the City of Grafton, chapter 79, Acts of 1913, and see if power of the chief of police to arrest without warrant in any case be found therein. Paragraph 3 of section 7 thereof confers on the council authority to prescribe the duties of officers and employees. Paragraph 2 of section 8 authorizes the commissioners, not the council, among other officers to appoint a police judge and a *chief of police,* but nowhere in the charter are the powers and duties of the chief of police prescribed. Certainly the charter does not give the chief of police the right to exercise within the municipality all of the powers conferred on a constable by chapter 50 of the Code, including those conferred by section 221, to arrest without warrant for offenses of which the justice has jurisdiction. On the trial, section 7 of an ordinance, said to relate to the issuance of warrants, and section 13 of Ordinance LV-A, which appears to relate to prohibition of the

manufacture, sale and storing of intoxicating liquors, were introduced in evidence. By the said seventh section the mayor or the police judge, if one be appointed, upon information made under oath or examination that any person is offending in the manner prescribed, is authorized to issue his warrant requiring the person suspected to be brought before him for examination, and requiring the police officer to search any house, building, etc., and to arrest the parties found therein, etc. Section 13 of the other ordinance prescribes offenses, and makes any one guilty of a misdemeanor for the violation of the ordinance. But we find nothing in either of these ordinances justifying an arrest by a police officer without warrant. The state undertook to supplement these ordinances by inquiring of the mayor on the witness stand as to the authority of the chief of police to make the arrest without a warrant, and he gave it as his opinion that under this charter and the ordinances, the police officer was acting in the discharge of his duty when he made the arrest. But the opinion of the mayor is not law, nor can it supply the requirement of specific authority.

Failing to find authority for such an arrest without a warrant in any of these statutes and ordinances, we have had recourse to section 29 of chapter 32A, Barnes' Code 1918. That section among other things provides: "It is hereby made the duty of the mayor of a municipality, or the person acting as such, and police of a municipality, to enforce the prohibition laws of the state within the municipality, independently of any ordinance, or want of ordinance of the municipality." It occurred to us that possibly under this provision authority for the arrest by a police officer without a warrant could be found. But can we say, without resorting to inference or conjecture, that such was the intention of the Legislature? If the council might by ordinance have conferred this authority, it does not appear to have done so. Municipal authorities may comply with the requirements of said section without resorting to arrest without warrant; and it is not necessarily within the mandate of the statute that the council shall by ordinance confer such specific authority, and it seems to us that in view of the great and prerogative right coming down to us through *Magna Charta*, we should not read into the statute what is not there found in plain and

certain terms. So our conclusion is that the arrest of the defendant without warrant was not justified in law.

Our next inquiry is: Can the prisoner's offense of having on his person more liquor than allowed by law, or possession of the deadly weapon, be said to have been committed in the presence of the officer, and that the arrest without a warrant was lawful on that ground? We can not so hold. Before the officer made the arrest he committed a trespass upon the person of the accused, by putting his hands on his pockets, whereby he elicited from him the confession relied on. The evidence discloses no confession as to the possession of a revolver, nor does it appear that it was seen by the officer, unless he saw it at the time the shooting occurred, which was after the arrest.

According to the general rule recognized by numerous decisions, an offense is committed in the presence of the officer when he sees it with his eyes or sees some one or more of a series of continuous acts which constitute the offense, when it may be said the offense was committed in his presence. 5 C. J. 416, §45, and many cases cited. In some states the common-law rule has been changed or modified by statute. For example, in the case of carrying concealed weapons, in the states of Alabama, Florida, Illinois and a few others the officer may arrest without warrant, as for a breach of the peace. 5 C. J. 405, §31, and cases cited in notes 18-20; 1 Wharton's Criminal Law, (11th ed.), 178, §136, and cases cited; *Ex parte Rhodes,* (Ala.), 1 A. L. R. 568, note 585. In *Weatherington* v. *State,* 13 Ga. App. 408, we find an arrest without warrant was justified where the accused had voluntarily disclosed to the officer that he had a valise containing liquor. But an examination of that case shows the officer made no examination or search into the contents of defendant's valise, but that he voluntarily disclosed its contents. The court says: "The possession of such a large quantity might authorize the inference that its possession was keeping the whiskey for the purpose of illegal sale, and would authorize his arrest upon the charge of violating the municipal ordinance upon that subject, on the ground that the offense was committed in the presence of the officer."

It follows from the foregoing discussion that instructions number fourteen and sixteen are bad, in that they erroneously

assume the arrest of the prisoner was lawful and that the prisoner had no right to resist such an arrest, and the consequences following such resistance. Number fifteen was bad because it told the jury that the officer was justified in making the arrest without warrant if they found the prisoner was then guilty of the offenses there described.

We have examined with care the instructions of the prisoner given and refused. Number five, refused, said: "The court instructs the jury that a person about to be attacked, or believes he is about to be attacked, and has reasonable cause for so believing is not bound to wait until his adversary gets close enough to him to strike him, but may act on appearances, and take steps to prevent such striking, even unto the taking of life." It was properly refused. The evidence did not justify it. When the fatal shot was fired, the deceased was down on his hands and knees in the street, where defendant had pushed him, with his back toward defendant, in the act of arising, and was making no demonstration of violence toward the prisoner. True, the prisoner says the officer had hit him on the head with his mace. But he had pushed, if not knocked, the officer down, and there did not then appear to him necessity for killing the officer.

Instruction number six, relating to malice, without the modification proposed by the court, which the prisoner declined to accept, was rightly rejected.

Instruction number eleven, relating to arrest without warrant for a misdemeanor, without the modification proposed by the court, was rightly rejected. The language rejected was, "and if the officer makes said arrest without said warrant the officer does so at his peril." And instruction number thirteen, relating to the right of one in resisting an illegal arrest, was also rightly rejected. As we have already pointed out, the right of resistence does not go to the extent of taking the officer's life, unless the accused believes and has reason to believe that it is necessary to do so to protect his own life or to save himself from some great bodily harm. Unless confronted with such imminent dangers, the duty of the accused is to submit to the arrest and resort to legal process to obtain his liberty. So that both of

these instructions were too broad, and were properly rejected. *State* v. *Clarke, supra,* syl. 17.

Instruction number twelve, rejected, would have told the jury: "The court instructs the jury, that under ordinance LV of the Charter of the City of Grafton, Taylor County, W. Va., a city police officer has no authority to make an arrest, and place in jail one suspected of violating said ordinance, without a warrant, and if the jury believe from the evidence that the deceased, J. E. B. Phillips, arrested the defendant, without authority of law, the jury are instructed in considering their verdict to give this fact such weight as is due it." From what we have already observed respecting the ordinance referred to in this instruction, we think the instruction stated the law applicable to the facts in the case and that the court erred in refusing it.

The foregoing calls for reversal of the judgment, and our judgment will be that the verdict be set aside and that the prisoner be awarded a new trial.

*Reversed and remanded.*